**161]**                    *KERR AND OTHERS v. MACK.

Entry of land vague and uncertain at the time when made, can not be sustained because its calls obtain subsequent notoriety.

THIS case came before the court upon a bill of review, and was reserved for decision here, in Adams county. The material facts were as follows:

Robert Mack prosecuted his bill in equity against Kerr and others, to obtain from them the legal title to three hundred acres of land, alleged to be covered by his elder entry, No. 4,834, but for which the defendants had obtained a patent upon a junior entry. Mack's entry was made February 3, 1806, and in these words:

Robert Mack enters 750 acres of land on the waters of Eagle and Brush creeks, beginning at the northwest corner of Thomas Blackwell's survey, No. 2,060, running south 23 west, with Blackwell's line, to his southwest corner, thence with another of his lines south 67, east 110 poles, thence south to the line of Charles Morgan's survey, thence with Morgan's line west to his northwest corner, thence south 200 poles, thence north 67 west, and from the beginning north 67 west, so far that a line south 23 west will include the quantity. This entry was surveyed February 5, and recorded February 25, 1807.

Thomas Blackwell's survey, 2,060, called for in Mack's entry, calls to lie on the waters of the west fork of Brush creek, to begin at an elm and two ashes, southwest corner to his former survey, No. 1,043, and southeast corner to his other survey, No. 2,059. Was made April 2, 1792; recorded May 10, 1792.

There is no evidence that Blackwell's survey, 1,043, called for in the above survey, ever existed. His survey No. 2,059 calls to lie

on the waters of the west fork of Brush creek, beginning at a mulberry and two sugar trees, northwest corner to his survey No. 1,043, southwest to Robert Morrow, No. 1,306, and southeast to Abraham Buford, No. 398, running with Buford's line. Executed March 30, and recorded May 9, 1792.

There is no proof that the surveys of Morrow or Buford, called for in this entry, ever existed.

The entry under which the defendants claimed, was made 23d day of March, 1806, and called to lie on the waters of Brush and Eagle creeks, beginning at an ash and two elms, westerly corner to Thomas Blackwell's survey No. 2,060, running with his line and *course thereof, north 23 east 385 poles, thence west 200 [162 poles, thence south 400 poles, thence east and from the beginning south 67 east, for quantity. This entry was surveyed and carried into grant before that of the complainant.

The bill charged that the defendant, Kerr, who made the entry and survey, had full notice of Mack's entry when the latter entry was made. Kerr, in his answer, admits that before making the entry, he saw Mack's entry on the books of Anderson, but alleges that the calls were so vague and uncertain that he did not know where it was intended to lie, and insists that it was void for uncertainty.

The Supreme Court, consisting of Judges McLean and decreed in favor of Mack, to reverse which decree this bill of review is prosecuted.

Brush and Scott presented arguments for the complainants in the bill of review. No arguments are furnished on the other side.

They maintained that Mack's right to a decree depended upon the validity of his own entry—that this called for Blackwell's and Morgan's surveys, and unless these were notorious at the time Mack's entry was made, it wanted notoriety. It was not enough that the surveys called for could *now* be identified. Notoriety acquired after the entry was made, could not sustain it. An entry bound upon other entries or surveys, is not valid, because those surveys have been made and recorded. It is not the record of a survey, but the notoriety on the ground, that is necessary: They cited Hardin, 73, 89, 103, 116, 287; 1 Bibb, 7, 35, 61, 81, 86, 139; 2 Bibb, 106.

They maintained that Blackwell's survey, 2,060, carried on its

171

face no character of notoriety; that it could only be found by reference to Blackwell's other two entries, which it called for; that one of these, No. 1,043, did not exist; that the other, 2,059, was based also upon the survey 1,043, and two other surveys which were not known to have been made or to exist. Mack's entry, therefore, was destitute of both direct and relative notoriety.

They contended that the fact of notice could not vary the case; that the entry must be good when made. It could derive no validity from the fact that the person claiming knew where it was intended to appropriate the land. It could not be good against one person and vicious against another. It must be valid against everybody, or none. It appropriated the land against all the world so soon as the entry was made, or it never appropriated it.

**163]** *Opinion of the court, by Judge BURNET:

The evidence does not show that the surveys of Blackwell and Morgan had acquired notoriety at the time Mack's entry was made. It is admitted by Kerr that he had seen the entry of Mack on the books of the surveyor before he made the entry No. 4,962, but, from its vague and uncertain calls, he did not know where it was intended to lie. On this fact, the complainant Mack chiefly relied as sufficient to support his claim. The question, therefore, presented for decision is, whether an entry, vague and uncertain at the time of its inception, can be supported by evidence that its calls had acquired notoriety, or had become known to a subsequent locator, prior to the date of his conflicting entry.

The great difficulty in settling titles within the Virginia military district arises from the expressions in the statute which directs the mode of making locations. They must be made so specially and precisely that others may locate the adjoining residuum with certainty. The indefinite import of these expressions has opened a wide door for judicial construction, and has led to the establishment of a variety of rules, which approach very near to legislation, but which seems to have been necessary to sustain a large portion of the early entries. These rules have been gradually introduced and so modified from time to time as to produce the least inconvenience with the greatest degree of justice to contending parties, and to place the titles of real property, ac-

quired under the laws of Virginia, on as secure ground as the loose mode of appropriation would well admit.

An entry, to be special and precise, should be made in such words as will point it out to third persons, and distinguish it with clearness from all others. If such language be not used, a subsequent locator can not take the residuum with certainty; but what words or descriptions will be sufficient for the purpose, must be decided by the court, and should be determined by general rules, established for the government of all cases to which they can apply. These rules should not be lightly disturbed or deviated from, because they may appear to operate severely in particular cases. It is better to have an imperfect rule than to be without any. If a rule be often departed from, it ceases to be such, and each case is left to be decided by the impression which some imaginary distinction or peculiar circumstance of apparent hardship may make on the mind of the judge. Such a course would be arbitrary—it would expose litigants to the effect of partiality and prejudice, which may, unperceived, influence *the mind of [164 the most upright; and it might induce the unsuccessful claimant to ascribe his loss rather to the feelings of the court than the decision of the law. It is important, in the administration of justice, that the unfortunate party should go out of court with an impression that his case has been determined agreeably to known and established principles, although he may believe they have operated unjustly in his particular case. The cause we are now determining is one which pleads as strongly for a relaxation of the rule as any other we can well imagine. There is an apparent want of equity on the side of the complainant, calculated to induce a prejudice against his title. At first view, it would seem to be unjust and inconsistent with our earliest impressions of right and wrong, to permit a person with a knowledge of a prior entry, intended to appropriate a tract of land, to locate the same tract, and to dispossess the occupant, because his location was not made so specially and precisely as to afford notice at the time it was made. But when we consider that the first location was not made agreeably to law, in consequence of which the locator acquired no legal right, and reflect on the importance of adhering rigidly to the forms prescribed for the acquisition of property, and the uncertainty that would result from a contrary course, the propriety of conforming to the rule becomes apparent. The courts of Ken-

tucky, which are more conversant with the land laws of Virginia, and have a deeper interest in the correct exposition and application of their principles than any other tribunals in the country, have, by a course of decisions, settled the principle that notoriety must be co-existent with the entry, and that no after acquired notoriety can aid it. In McClanahan v. Berry, Hugh. 177, the court say that the place called for in the locations of the appellee, had not that notoriety *when the locations were made*, which the land law and the reason of the case required, and as none of the other calls were precise and unequivocal, he had not made out a legal or equitable right to recover. In Key v. Matson, Hard. 73, this principle was departed from. It is there said, that an entry can not be supported, unless it call for some object which was notorious, or *became notorious before the conflicting entry was made*. But in the case of Smith v. Smith, Hard. 191, the doctrine of McClanahan v. Berry was assumed, and the principle recognized in Key v. Matson was overruled. The complainant failed because it was not shown that the objects called for had acquired any notoriety *previous to the date of his entry*.

The same doctrine is supported in *Craig v. Baker*, Hard. 287, 165] and *it is worthy of remark that this case is referred to by the reporter, in a note to Key v. Matson, as deciding that the objects called for must be notorious at the date of the entry calling for them, and consequently as overruling the authority of that case.

Couchman v. Thomas, Hard. 270, goes on the same principle. The complainant's entry was made in 1782—the calls were not calculated, *at that time*, to apprise the holder of another warrant that the land in controversy was appropriated. The objects described had not notoriety by themselves, or in conjunction with any of the other calls in the entries, *at the date thereof*. Speed v. Lewis, Hard. 476, is also in point. There being no proof, in that case, that the objects called for in Speed's entry, were generally known *at the time it was made*, the conclusion, said the court, must be that his entry can not be sustained.

Judge Bibb, in the introduction to the first volume of his reports, page 20, says that notoriety must be co-extensive with the entry. As the cases above cited had been decided, and reported before the introduction was written, the judge might with safety have relied on their authority for the support of his position, but he has gone

into a course of reasoning on the point, which seems to sustain him independent of the authority of adjudged cases.

In Mosby *v*. Carland, 1 Bibb, 86, the court were of opinion that an entry should be taken as it would have been understood, *on the day it was made.*

In Galloway *v*. Neal, 1 Bibb, 140, the question turned on the notoriety of a survey, called for in an entry. The record exhibited no evidence of the notoriety of that survey, *at, or before the entry.* The certificate of survey contained no description which could be reasonably calculated on, to inform other holders of warrants where it was situate. The court decided in that case, that if the holder of a warrant adopts a survey, made on another warrant, as the basis of a location, he must prove the notoriety of the survey *at that period,* otherwise his location can not be supported; and because the complainant had not made out that the survey in question had been generally known to those conversant in that neighborhood, *at the date of his entry,* his location was not supported.

In Woolley v. Bruce, 2 Bibb, 106, it was decided that "the complainant's entry must rest on its sufficiency, *at the time it was made,* and the *then* notoriety of the objects called for. If they were *then* insufficient to enable a subsequent locator, by using reasonable diligence, to find them, it must be taken to be insufficient. *No after \*acquired notoriety can aid it.* It must possess the [166 intrinsic qualities of good entry at the time it is made, and not rely on mere contingencies, that may or may not happen."

In Bowman *v*. Melton, 2 Bibb, 155, the notoriety of the object. called for, was required to exist *before the date of the entry* in question. The same principle is supposed in Carson *v*. Harway, 3 Bibb, 160; Devour *v*. Johnston, Ib. 411; Hanley *v*. Hardin, 4 Bibb, 576; Woolfscale *v*. Meriweather, Ib. 138; Galloway *v*. Webb, 1 Marsh. 129; Howard *v*. Todd, Ib. 277; Haws *v*. Marshal, 2 Marsh. 415.

In Craig *v*. Pelham, Pr. Dec. 287, it was decided that although the subsequent locator had *notice in fact,* of the land intended to be secured, it was insufficient, and that if the entry was not special in itself, the proprietor could not hold under it.

In Wilson *v*. Mason, 1 Cran. 100, complete notice had been obtained of the elder claim before the subsequent entry was made, but the court decided that titles must rest on general principles. Therefore the junior entry of Wilson, who was charged with actual

notice, was sustained, against the prior survey of Mason, because the survey was not supported by a legal entry.

This doctrine is reasonable, as well as conformable to the statute; for although the certainty required, is designed principally for the convenience and safety of subsequent locators, yet it is required absolutely, and can not be dispensed with.

The validity of an entry should not depend on the fact whether a subsequent locator has been misled, or whether he is liable to be misled, it ought, therefore, to be so special, precise, and certain, that a stranger may proceed immediately to locate the adjoining residuum without the danger of interference. The statute which gives the right to appropriate land points out the mode in which it shall be done, and it is necessary to pursue that mode, in order to make a valid appropriation. The properties of a valid entry are designated, and the court are not at liberty to disregard them. An entry must be special, precise, and certain. If either of these requisites can be dispensed with, they may all be disregarded, and every locator be at liberty to make his entry, as convenience or caprice may dictate; but the law certainly intended to guard against the confusion and uncertainty that would result from such a course. If an entry does not contain such calls as will enable a diligent inquirer to locate it, it is void, because not made in conformity with the statute.

There seems to be an inconsistency in saying that an entry, which *is evidently void when made, shall become valid by the lapse of time. This would be to test the validity of a title, by matter extrinsic, when the statute requires such matter to be contained in the record of the entry. It would also very much increase the danger resulting from the use of parol testimony. The courts of Kentucky have given a very liberal construction to the land laws of Virginia, and have gone as far to support vague and doubtful entries, as was in any degree consistent with the intention of the legislature or the safety of the parties interested. The door to the admission of parol evidence is already open to a very dangerous extent. To open it wider would be increasing the danger of supporting vague locations, to the prejudice of the careful and vigilant locator. An unprincipled or mistaken witness may be brought to testify that an entry, void for want of notoriety at its date, had acquired general notoriety, or had become known to a subsequent locator, prior to his entry. In such case the court

would be required not only to set aside the junior entry made in conformity to the statute, but to support the prior entry, although null and void in itself; or, in other words, it would decide that an entry, void at its creation, may be rendered valid by the accidental circumstance that a subsequent valid entry has been made on the same land.

The commonwealth of Virginia, in their cession to the general government, reserved so much of the land between the Scioto and the Little Miami rivers as should be necessary for the satisfaction of a particular description of warrants. Congress accepted the cession of the entire territory subject to that reservation, and as Virginia retained the right to prescribe, and has prescribed by statute, the manner in which the lands shall be entered and appropriated, the general government, to whom the title was conveyed in trust, can not be required to convey to a person who has not entitled himself to a conveyance by a compliance with the statute.

A defective entry, being an attempt to appropriate the land contrary to the statute, can not authorize the locator to demand a title, nor justify the government in granting one. The confirmation, therefore, of a junior valid entry can not be considered as an act injurious to the claimant of a defective senior entry, because the latter, independent of the rights of the former, could not be entitled to a patent, nor could the government grant it without a breach of trust. In other words, an attempt to appropriate any part of this land contrary to law creates no right, nor can it prevent a subsequent locator from making a legal appropriation of the same land. *Until a legal entry be made, the land must be [168 considered as unincumbered, and although a defective entry may have been made, it must be as liable to be taken by a subsequent legal entry, as if such defective entry had not been made, or had been made on a description of warrant not recognized in the act of cession.

In Wilson *v*. Mason, the Supreme Court say that "the legislature of Virginia, when bringing her lands into market, had *undoubtedly* a right to prescribe the terms on which she would sell, and the mode to be pursued by purchasers, for the purpose of particularizing the general title acquired by obtaining a land warrant, and that the court was by no means satisfied of its power to substitute any equivalent act for that required by the law." The State of Virginia, with equal certainty, had a right to prescribe the terms

and dictate the mode of locating her military warrants, which are evidences of purchase. Such a measure was necessary for the safety and convenience of those concerned, as well as to insure an equitable distribution of the good lands. But it is enough to say that the legislature had a right to prescribe, and that she did prescribe the mode in which all entries should be made, and that no other power can dispense with it or substitute an equivalent.

It will be noted that the mode of entering and locating the warrants in question was declared by statute in 1779. The law for ceding the territory northwest of the river Ohio, did not pass till 1783, and when it did pass, it was on condition that Congress should hold the lands between the Scioto and Little Miami subject to the claim of the holders of Virginia military warrants, for which purpose it had been previously set apart.

It seems to follow, from these premises, that the holders of military warrants are vested with certain rights, which are ascertained by the statute, and should be regarded by the government, which is to be viewed in the light of a trustee. One of those rights is, that until the land be legally appropriated, any holder of a warrant may locate and secure it—consequently, a conveyance to a locator, who has not entitled himself to a patent by conforming to the statute, would be an abridgment of that right and a breach of trust. It is also contended that if an entry, defective in its origin for want of notoriety, become known to a subsequent locator before his entry is made, that circumstance ought to operate as notice in ordinary cases, and charge the second locator with the equity of the first claim. This, however, is only presenting the same question in a different form, and does not, in the least degree, free it **169]** from the \*difficulty and inconsistency before noticed. The cases of Wilson *v*. Mason and Craig *v*. Pelham, before cited, maintain the contrary doctrine. In both cases it is decided that *actual notice* is not sufficient. In the former case, the Supreme Court of the United States say, "that land can not be lawfully appropriated without an entry—that notice of an illegal act can not make it valid—that a survey not founded on an entry (by which we understand a legal entry) is a void act, and constitutes no title whatever, and that consequently the land so surveyed remains vacant, and liable to be appropriated by any person holding a land warrant." It would be difficult to point out the difference between a survey made without an entry, as was Mason's, and a survey

178

made on an illegal entry, as was the defendant's; because an illegal entry is as no entry. The land, therefore, in either case, must remain vacant, and liable to be appropriated.

The doctrine of notice, however, it is believed, has never been applied to cases under the land laws of Virginia, when the parties claim under distinct entries. In every such case, each claimant must rest on the validity of his own title, and if the elder entry be so defective as to be pronounced illegal, which must be the case if the junior is sustained, those defects will vitiate that entry independent of any influence arising from the junior entry. Each entry must stand or fall on its own merits, and the knowledge of the last location can neither aid nor injure the first location; if that be illegal, it is rendered so by its own defects, which can neither be increased nor diminished by anything connected with an adverse entry, or with him who holds it.

If a person in possession of land has purchased it for a valuable consideration from one having no right or title whatever, and a third person, with a knowledge of the facts, afterward purchases the same land from the real owner, his knowledge shall not affect him, because it can not aid the defective title of his adversary. In like manner, if a person contract for the purchase of real estate, by parol contrary to the form of the statute, and afterward another person, with full notice of such notice, makes a legal contract for the same land, his purchase shall not affect him; nor aid the first purchaser. For the same reason, the notice of Kerr can neither affect him nor aid the illegal title of his adversary. The doctrine of notice applies strictly to cases in which a person contracts for a title with notice of a prior legal contract for the same title, and not to persons who claim under different titles, one of which must necessarily be void, as is the fact in the case before us. Upon the whole, we are clearly of opinion that the decree is erroneous, and must be set aside.